USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___9/26/2025___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ICON INTERNATIONAL, INC.,<br><br>                    Plaintiff,<br><br>          -against-<br><br>ELEVATION HEALTH LLC,<br><br>                    Defendant. | |
| ELEVATION HEALTH LLC,<br><br>               Defendant/Counterclaim-<br>               Plaintiff,<br><br>          -against-<br><br>ICON INTERNATIONAL, INC.,<br><br>                    Plaintiff/Counterclaim-<br>                    Defendant. | **OPINION DENYING MOTION<br>FOR JUDGMENT AS A<br>MATTER OF LAW, DENYING<br>MOTION FOR A NEW TRIAL,<br>AND GRANTING IN PART<br>AND DENYING IN PART<br>CROSS-MOTION**<br><br>1:22-cv-4304-MKV |
| ELEVATION HEALTH LLC,<br><br>               Defendant/Third Party<br>               Plaintiff,<br><br>          -against-<br><br>GYPSET, INC., DAYNA ZEGARELLI, JOE DAVIS,<br>CLARENCE V. LEE III, and KHALID ITUM,<br><br>               Third Party Defendants. | |

MARY KAY VYSKOCIL, United States District Judge:

Plaintiff Icon International, Inc. ("Icon") brought this action against Defendant Elevation

Health LLC ("Elevation") for breach of contract.  [ECF No. 1 ("Complaint")].  Elevation then filed

counterclaims against Icon and third-party claims against third-party Defendants Gypset, Inc.

("Gypset"), Dayna Robin-Zegarelli, Joe Davis, Clarence V. Lee, III, Mario Gonzalez, and Khalid

1

Itum,[1] alleging breach of a separate contract, civil conspiracy, fraud, and unjust enrichment.[2]  *See*
[ECF No. 38 ("Amended Counterclaim")]; [ECF No. 39 ("Amended Third-Party Complaint")].[3]
The parties thereafter stipulated to the dismissal of Mario Gonzalez and Khalid Itum and Elevation
abandoned its unjust enrichment claims.  [ECF Nos. 161, 177, 191 ("Itum Voluntary Dismissal")].

The case was tried before a jury for four days, during at which five witnesses testified,
portions of another witness's deposition were read to the jury, and forty-eight exhibits were
received in evidence. Prior to the parties' closing arguments, the Icon Parties moved for judgment
as a matter of law ("JMOL") on all claims.  [ECF No. 195-4 ("Trial Transcript" or "Tr.") 424:05–
426:14].  The Court denied the motion on the breach of contract claims and reserved judgment on
the fraud and civil conspiracy claims. Tr. 430:03–07.  Before charging the jury, the Court
confirmed that neither party objected to the jury instructions that the Court intended to use.  Tr.
422:13–18.  After the charge was read to the jury, the Icon Parties requested two minor
clarifications, to which Elevation did not object, and which the Court implemented and explained
to the jury. Tr. 525:02–530:13.

The jury returned a verdict against Icon on its breach of contract claim, and for Elevation
on its breach of contract, fraud, and civil conspiracy claims.  [ECF No. 192 ("Judgment"), 205
("Verdict Sheet")].  The jury awarded damages to Elevation for its breach of contract claim in the
amount of $2,820,000 ($820,000 against Gypset and $2,000,000 against Icon).  *See* Judgment;

---

[1] Dayna Robin-Zegarelli is the founder and sole owner of Gypset.  Tr. 396:02–05.  She is the "significant other" of
Defendant, Joe Davis, who did work on behalf of Gypset.  Tr. 348:19–351:06; DX-5.  Clarence V. Lee is the CFO of
Icon and owns 50% of the company.  Tr. 147:22–24.  Conflicting evidence about Itum's role—whether he was an was
an agent of Icon and Gypset—was presented at trial.  *See, e.g.*, Tr. 176:6–18, 333:05–10.  In the present motion,
whether Itum is an agent of Icon and Gypset is not at issue.

[2] Elevation brought its breach of contract claim against only Icon and Gypset, but brought the civil conspiracy, fraud,
and unjust enrichment claims against Icon and all third-party defendants (together, the "Icon Parties").

[3] The allegations in the Amended Counterclaim and the Amended Third-Party Complaint are identical. For simplicity,
we cite only to the Amended Counterclaim.

Verdict Sheet.  On its fraud and civil conspiracy claims, the jury awarded Elevation compensatory damages in the amount of $835,000 ($450,000 against Icon $150,000 against Gypset $10,000 against Zegarelli, $75,000 against Davis, and $150,000 against Lee) and punitive damages in the sum of $180,000 ($75,000 against Icon, $25,000 against Gypset, $5,000 against Zegarelli, $25,000 against Davis and $50,000 against Lee).  *See* Judgment; Verdict Sheet.

Before the Court are post-trial motions from both sides.  Icon, Gypset, Zegarelli, Davis, and Lee (together the "Icon Parties") move for JMOL pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, or, in the alternative, for a new trial pursuant to Rule 59(a), and have posted a supersedeas bond. [ECF Nos. 193, 194 ("Icon Mem."), 195 ("Tross Decl."), 197].  The Icon Parties request oral argument in connection their motion.  [ECF No. 196].  Elevation opposed and filed a cross-motion, without identifying the Federal Rule under which it moved, seeking a ruling that Icon and Gypset are jointly liable for contract damages as joint-venture partners and adding pre- and post-judgment interest to the Judgment.  [ECF No. 198 ("Cross Mot."), 199 ("Mukherjee Decl."), 200 ("Elevation Mem.")].  The Icon Parties replied in further support of their motion, opposed Elevation's cross-motion and filed a supplemental declaration in support.  [ECF Nos. 201 ("Icon Reply"), 202 ("Tross Supp. Decl.")].  Elevation filed a reply in further support of its cross-motion.  [ECF No. 203 ("Elevation Reply")].

The Court assumes familiarity with the factual background, procedural history, and trial transcript in this case.  *See* Tr.  This Order sets forth only those facts necessary to contextualize the Court's rulings on the present motions.  For the reasons explained below, the parties' motions are DENIED, except that Elevation's motion for an award of post-judgment interest and post-verdict, pre-judgment interest is GRANTED.

# LEGAL STANDARD

## I. Post-Verdict Motion for JMOL

Under Rule 50(a)(1), "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," a district court may "resolve the issue against the party" and "grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 50(a)(1). A motion for JMOL "alert[s] the opposing party to the supposed deficiencies in his proof, thereby affording the nonmoving party 'an opportunity to cure any deficiency in that party's proof that may have been overlooked until called to the party's attention by a late motion for judgment.' " *Kerman v. City of New York*, 374 F.3d 93, 118 (2d Cir. 2004) (citations omitted) (quoting Fed. R. Civ. P. 50 Advisory Committee Note (1991)).

Pursuant to Rule 50(a), under this rule "a party may move for judgment as a matter of law ('JMOL') during trial at any time prior to the submission of the case to the jury." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998) (citing Fed. R. Civ. P. 50(a)(2)). If the court denies a Rule 50(a) motion made at trial, the movant may renew its motion for JMOL under Rule 50(b) following an unfavorable verdict. *See Galdieri-Ambrosini*, 136 F.3d at 286 (citing Fed. R. Civ. P. 50(b)). A posttrial motion filed pursuant to Rule 50(b) is "limited to those grounds that were specifically raised" in the prior motion for JMOL and the movant may not add new grounds after trial.[4] *Id.*; *accord Lore v. City of Syracuse*, 670 F.3d 127, 153 (2d Cir. 2012). The 50(a) motion "must at least identify the specific element that the defendant contends

---

[4] A party filing a renewed motion for JMOL "may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b).

is insufficiently supported." *Galdieri-Ambrosini*, 136 F.3d at 286. "In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b).

"To warrant post-verdict judgment as a matter of law, the movant must show that the evidence, when viewed most favorably to the non-movant, was insufficient to permit a reasonable juror to have found in the non-movant's favor." *Conte v. Emmons*, 895 F.3d 168, 171 (2d Cir. 2018). This standard imposes a high burden that is "met only in rare occasions." *Id.* (internal quotation marks omitted); *see Cross v. New York City Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005) ("A movant's burden in securing Rule 50 relief is particularly heavy after the jury has deliberated in the case and actually returned its verdict."). "The movant, generally, must be able to show a 'complete absence of evidence supporting the verdict [such] that the jury's findings could only have been the result of sheer surmise and conjecture.' " *Conte*, 895 F.3d at 171 (quoting *Luciano v. Olsten Corp.*, 110 F.3d 210, 214 (2d Cir. 1997)) (alteration in the original). In resolving such a motion, "[t]he court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001) (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir.1988)).

## II. **Motion for a New Trial**

A district court may, on a party's motion, "grant a new trial on all or some of the issues— and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Rule 59(a) . . . [imposes] a less stringent standard than Rule 50 in two significant respects: (1) a new trial under Rule 59(a) may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial

judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *Manley v. AmBase Corp.*, 337 F.3d 237, 244–45 (2d Cir. 2003) (internal quotation marks omitted).  However, "a court should rarely disturb a jury's evaluation of witness credibility." *Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 286 (S.D.N.Y. 2008) (citing *DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998)).  "[T]he mere fact that the trial judge disagrees with the jury's verdict is not a sufficient basis to grant a new trial."  *Id.* at 287 (citing *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir. 1983)).  "Although the standard for granting a new trial pursuant to Rule 59 is less onerous than that for granting judgment as a matter of law pursuant to Rule 50, it is still high."  *Tardif v. City of New York*, No. 13-cv-4056 (KMW), 2023 WL 2495897, at *6 (S.D.N.Y. Mar. 14, 2023).  "[A] motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  *See Ortiz v. Stambach*, 137 F.4th 48, 72 (2d Cir. 2025) (quoting *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004)).

### III. <u>Motion to Alter or Amend Judgment</u>

A court should grant a Rule 59(e) motion to alter or amend a judgment only where the movant "identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Metzler Inv. Gmbh v. Chipotle Mexican Grill, Inc.*, 970 F.3d 133, 142 (2d Cir. 2020).  A motion asserting clear error or manifest injustice "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked."  *Phoenix Light SF DAC v. U.S. Bank Nat'l Ass'n*, No. 20-1312-CV, 2021 WL 4515256, at *3 (2d Cir. Oct. 4, 2021) (quoting *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012)).

## DISCUSSION

### I. Icon Parties' Motion for Post-Verdict JMOL

As noted, *see supra* at 2, after the evidentiary record was closed and prior to the parties' closing arguments, the Icon Parties moved for JMOL on all claims. Tr. 424:7–11. They argued that Icon's breach of contract claim succeeded, and Elevation's breach of contract counterclaim failed as a matter of law because, with respect to both contracts, Elevation did not timely or effectively reject the subject goods. Tr. 424:18–426:03. The Icon Parties additionally argued that Elevation's fraud, and thus the civil conspiracy claims, failed as a matter of law because Elevation had not proven the element of damages. Tr. 426:01–14. The Court denied JMOL on the breach of contract claims, noting that there is evidence going both ways on each claim and that there was not such an absence of evidence that a reasonable jury, crediting all inferences in the light most favorable to Elevation, could not find in favor of Elevation on both claims. Tr. 429:10–430:02. The Court reserved judgment on the fraud and civil conspiracy claims. Tr. 430:03–07.

The Icon Parties now have renewed their motion for JMOL pursuant to Rule 50(b) and request that the Court grant post-verdict judgments (1) in Icon's favor on its breach of contract claim, (2) in Icon and Gypset's favor on Elevation's breach of contract claim, and (3) in favor of all Icon Parties on the fraud and civil conspiracy claims.

### A. Icon Is Not Entitled to Judgment on Either Contract Claim

Regarding Elevation's claim, Elevation argued at trial that Gypset and Icon had breached a December 31, 2021, contract with Elevation (the "December 31 Agreement") to provide 400,000 iHealth COVID-19 test kits ("Test Kits") for a purchase price of $2,640,000.00. *See* Tr. 475:01–11; Amended Counterclaim ¶¶ 100–05; Amended Third-Party Complaint ¶¶ 100–05. The parties agree that Elevation paid for those Test Kits on December 31, 2021, well before they were

7

delivered.  Stipulated Facts ¶ 4 (citing PX-3.)  Elevation claimed that it properly rejected the Test Kits that were delivered pursuant to December 31 Agreement (the "First Shipment").  Tr. 449:23–449:03, 457:12–22.  Accordingly, Elevation sought return of the purchase price and additional damages for the First Shipment.  Tr. 475:01–11.

Regarding Icon's claim, Icon argued at trial that it had entered into an additional contract with Elevation on February 15, 2022 for the sale of 10,000,000 Test Kits for a total purchase price of $65,000,000 (the "February 15 Agreement").  Tr. 26:02–13; Complaint ¶¶ 6–7.  The parties agree that on February 17, 2022, Icon delivered 378,000 Test Kits (the "Second Shipment"). [ECF No. 154-1 ("Stipulated Facts") ¶ 23].  Icon claimed that Elevation breached their contract by failing to pay the $2,411,592.00 due for the Test Kits delivered in the Second Shipment.  Complaint ¶ 9; Tr. 26:12–17.  Elevation disputed that it entered such a contract and claimed, in the alternative, that it properly rejected the Second Shipment of Test Kits.  Tr. 435:15–16, 448:23–449:03, 457:12–22, 458:02–463:07, 474:04–22, 504:19–20.  At trial, Icon claimed that it delivered 378,000 of the 10,000,000 ordered Test Kits, pursuant to the February 15 Agreement, and that Elevation did not pay Icon for those Test Kits.  Tr. 504:12–18.  Accordingly, Icon argued that Elevation owes Icon $2,411,592 for the Test Kits delivered in the Second Shipment pursuant to the February 15 Agreement.  Tr. 504:18–19.

Icon now argues that Elevation agreed to the December 31 Agreement and the February 15 Agreement, that Elevation did not adequately reject either the First or Second Shipment.  Icon Mem.  Thus, Icon concludes that the Court should grant judgment in its favor on both breach of contract claims.  Icon and Gypset have not met their burden to establish "a complete absence of evidence supporting the verdict" on either breach of contract claim.  *Conte*, 895 F.3d at 171. Regarding Icon's breach of contract claim, a reasonable jury could have found that (1) Icon failed

to establish the existence of the February 15 Agreement and (2) even if the jury determined there was a contract, a reasonable jury could have found that Elevation properly rejected, and thus did not accept, the Second Shipment.  Regarding Elevation's breach of contract claim, a reasonable jury could have found that Elevation adequately rejected and thus did not accept the First Shipment from Icon.[5]

### 1. The Jury Could Have Found that Icon Failed to Establish the Existence of a February 15 Agreement

In order to prevail on breach of contract claim under New York law, a plaintiff must show that: (1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) the breach resulted in damages.  *See 34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52, 198 N.E.3d 1282, 1287 (N.Y. 2022); *Second Source Funding, LLC v. Yellowstone Cap.*, LLC, 144 A.D.3d 445, 445, 40 N.Y.S.3d 410, 411 (1st Dep't 2016); *Kasper Glob. Collection & Brokers, Inc. v. Glob. Cabinets & Furniture Mfrs. Inc.*, 952 F. Supp. 2d 542, 571 (S.D.N.Y. 2013).

Icon argues that "there can be no dispute that Elevation Health entered into a contract with Icon on February 15, 2022."  Icon Mem. at 3.  However, viewing the evidence most favorably to Elevation, there is ample evidence from which a reasonable jury could have found that Icon had not proven the existence of a February 15 Agreement, and thus failed to prove its breach of contract claim, without needing to reach the propriety of Elevation's rejection of the resulting shipment. The parties stipulated only that on February 15, 2022, Khalid Itum conveyed to Icon an order for 10,000,000 Test Kits at a purchase price of $65,000,000.  Stipulated Facts ¶ 22.  Icon also offered

---

[5] Elevation's breach of contract claim was brought against both Icon and Gypset and both parties move together for judgment as a matter of law on that claim.  *See* Icon Mem. at 11.  For ease of reference in this section, the Court will refer to only Icon.

into evidence an invoice with the same date and terms.  Tr. 69:21–24; PX-40, PX-41.  However, there was evidence before the jury that suggested that Elevation itself had not in fact agreed to the February 15, 2022 order for 10,000,000 Test Kits.  First, Joseph Goldsmith, one of two cofounders of Elevation, testified that he did not remember signing the February 15, 2022 invoice.  Tr. 209:09–17; 283:24–284:23.  The invoice in evidence in fact only included a generic DocuSign signature of Goldsmith's name.  PX-40.  Drawing an inference in Elevation's favor, the jury may have found that Icon had not met its burden to prove that Goldsmith in fact signed the invoice and agreed to the order.  Moreover, a jury may have inferred that it would be surprising for Goldsmith to forget ordering tens of millions of dollars' worth of Test Kits from Icon and Gypset after a previous order worth significantly less was delivered late, not refunded despite repeated demands, and resulted in litigation between Elevation and Gypset.  *See* Stipulated Facts ¶¶ 10, 13, 15–20.

A letter sent by Elevation's Counsel supports the inference that Elevation did not agree to the $65 million order.  It states that the shipment made pursuant to the February 15 invoice, at issue in this breach claim was "delivered without order or authorization."  *See* DX-39 (the "March 2022 Letter").

Moreover, both the December 31, 2021 invoice and the February 15, 2022 invoice included a term requiring prepayment.  *See* PX-40; DX-3.  While Elevation sent prepayment immediately pursuant to the December 31, 2021 invoice, Elevation did not send prepayment of the purported purchase price of the February 15, 2022 invoice.  *See* PX-40; DX-3; Tr. 333:11–334:20.  A reasonable jury could have inferred that this difference suggested Elevation may not have agreed to the purported February 15 Agreement.

Under New York law, generally, where a contract for the sale of goods is for the price of $500 or more, it will not be enforceable unless there is some writing that is (1) sufficient to indicate

that a contract for sale has been made between the parties and (2) signed by the party against whom enforcement is sought or by his authorized agent or broker.  N.Y. U.C.C. Law § 2-201 (McKinney 2025).  The standard for a contract between merchants for the sale of goods costing $500 or more is the following:  A contract is formed if within a reasonable time after the parties orally agree to the sale, one of the parties to the agreement sends some writing in confirmation of the contract and the party receiving the confirmation (1) has reason to know its contents and (2) does not object within ten days of receiving it.  *Id.*  No signature by either party is required.  *Id.*

Taking the Record evidence together, a reasonable jury could have found that Icon failed to establish the existence of a contract whether the parties were merchants or not.  If Elevation was not a merchant, a jury could have found insufficient evidence proving that Goldsmith had in fact signed the contract.  *See* N.Y. U.C.C. Law § 2-201 (McKinney 2025).  If the parties were merchants, a reasonable jury could have found insufficient evidence that Elevation had orally agreed to the sale prior to Itum's sending of the invoice or insufficient evidence to show that Elevation had "reason to know its contents."  *See id.*[6]

Although Elevation details much of this evidence in its opposition to Icon's motion for judgment as a matter of law, Icon does not address Elevation's argument.  Instead, it simply states that "[t]here can be no serious dispute that Icon proved the existence of a contract governing the Second Shipment" and cites to the Stipulated Facts.  Icon Reply at 2 (citing Stipulated Facts ¶¶ 22–25).  None of the cited Stipulated Facts inexorably required the finding that Joe Goldsmith in fact had signed the Second Shipment invoice or agreed to its contents.  *See* Stipulated Facts ¶¶ 22–25.

---

[6] While there was evidence presented from which a jury could draw an inference in favor of Icon, that Goldsmith was aware of the contract, and knew of its contents, PX-37, the Court here may not "weigh conflicting evidence."  *Tolbert*, 242 F.3d at 70.

In sum, there is ample evidence from which a reasonable jury could have found that Icon failed to prove the existence of a contract by a preponderance of the evidence. *Conte*, 895 F.3d at 171.

### 2. The Jury Could Have Found that Elevation Timely and Effectively Rejected Both the First and Second Shipments

Even if the jury found that Icon had established the existence of the February 15 Agreement, a reasonable jury could nonetheless have found that Elevation had properly rejected the Second Shipment as non-conforming goods and thus reached a verdict denying Icon's breach of contract claim. Moreover, regarding Elevation's breach of contract counterclaim and third-party claim, a reasonable jury could have found that Elevation adequately rejected the First Shipment as non-conforming and thus reached a verdict granting Elevation's breach of contract counterclaim and third-party claim. Section 2–607 bars the buyer, here Elevation, from any remedy where the buyer has failed to notify the seller of a breach within a reasonable time after discovering the same, or after a breach should have been discovered. N.Y.U.C.C. § 2–607(3)(a) (McKinney 2025). The movants have not established a complete absence of evidence supporting the finding that Elevation rejected the First and Second Shipments (1) in a reasonably timely manner and (2) on legally adequate grounds.

As an initial matter, both "[t]he sufficiency and timeliness of the notice is generally a question for the jury." *Tomasino v. Estee Lauder Cos. Inc.*, 44 F. Supp. 3d 251, 260 (E.D.N.Y. 2014) (citing *Hubbard v. Gen. Motors Corp.*, No. 95-cv-4362, 1996 WL 274018, at *4 (S.D.N.Y. May 22, 1996)); *Mendelson v. General Motors Corp.*, 432 N.Y.S.2d 132, 136 (N.Y. Sup. 1980), *aff'd*, 441 N.Y.S.2d 410 (2d Dep't 1981). Here, Icon's argument that, as a matter of law, Elevation

did not properly reject delivered goods does not warrant disturbing the jury verdict.  Icon. Mem. at 4–15.

### a. A Reasonable Jury Could Have Found That Elevation Timely Rejected Both Shipments

The First Shipment was delivered on February 15, 2022.  Stipulated Facts ¶ 20; PX-36. The Second Shipment was delivered two days later, on February 17, 2022.  Stipulated Facts ¶ 23; PX-49.  Slightly more than a month after the deliveries, on March 25, 2022, Elevation sent a letter rejecting both the First and Second Shipments. DX-39 (the "March 2022 Letter").  Goldsmith testified that before this letter was sent, he made "extensive rejections" "over and over again" orally to Itum.[7]  Tr. 244:05–18.  A reasonable jury could have found these rejections timely.

A buyer accepts goods if he "fails to make an effective rejection" within a "reasonable time" after delivery or tender and opportunity to inspect.  N.Y. U.C.C. Law §§ 2-602, 2-606; *Thread Couns. Inc. v. State*, 236 A.D.3d 504, 505, 231 N.Y.S.3d 6, 8 (1st Dep't 2025).  Whether rejection has occurred within a reasonable time depends on the "nature, purpose, and circumstances" of the action. N.Y. U.C.C. Law § 2-605 (McKinney 2025).  Where a buyer is a merchant, the definition of a "reasonable time" is determined by applying commercial standards. *Id.* § 2-607 cmt. 4.  Where a buyer is a "retail consumer," a "reasonable time" may be longer to avoid "depriv[ing] a good faith consumer of his remedy."  *Id.*

This kind of fact-specific reasonableness determination is best left to the judgment of the trier of fact unless "only one inference may be drawn as to the reasonableness of the time in which defendant rejected the goods."  *See New York City Off-Track Betting Corp. v. Safe Factory Outlet,*

---

[7] As previously explained, *see supra* n.1, there is conflicting evidence regarding whether Itum acted as an agent for Icon and Gypset. In its motion, Icon makes no argument regarding whether a reasonable jury could have found that Itum was acting as an agent for both Icon and Gypset when communicating with Goldsmith. Icon Mem.; Icon Reply.

*Inc.*, 28 A.D.3d 175, 178, 809 N.Y.S.2d 70, 74 (2006) (quoting *Tabor v. Logan*, 114 A.D.2d 894, 495 N.Y.S.2d 67, 68 (2d Dep't 1985)); *accord Paynes Cranes, Inc. v. American States Ins. Co.*, No. 12-cv-3497 RRM JO, 2014 WL 1271062, at *3 (E.D.N.Y. Mar. 26, 2014) (quoting *Mowers v. Paul Revere Life Ins. Co.*, 204 F.3d 372, 376 (2d Cir. 2000)) (" '[U]nless under the circumstances jurors could not reasonably differ,' reasonableness is a question for a trier of fact."). For instance, in *B/R Sales* it was uncontroverted that in the parties' industry a reasonable time for rejection was 48 hours after acceptance of shipments and thus, only one inference could be drawn as to the reasonableness of the rejection timing. *B/R Sales Co. v. Krantor Corp.*, 226 A.D.2d 328, 328, 640 N.Y.S.2d 204 (2d Dep't 1996). Here, no such uncontroverted industry standard was established, and on their motion for judgment as a matter of law, Icon and Gypset do not argue that there was any such industry standard. Indeed, the COVID-19 Test Kit industry in late 2021 and early 2022 was referred to as the "Wild West" four times at trial. Tr. 359:24–25, 361:21–24, 442:03–06, 474:01–03.[8] In the face of testimony about the chaotic, burgeoning COVID-19 test kit industry, a reasonable jury could have discounted the testimony of the only witness who arguably testified about an industry standard. He testified that he believed in the "business of selling merchandise" generally it was "uncommon"—and after a leading question "unheard of"—for a customer to reject a shipment of goods over a month after delivery. Tr. 164:05–14. A reasonable jury could have found that there was insufficient evidence to establish an industry standard for rejection. Moreover, there was evidence at trial that it may have taken time for Elevation to discover the expiration dates printed on each of the over 750,000 Test Kits, which was part of the reason for

---

[8] The Icon Parties' attorney stated during summation that "[i]t was not business as usual." 442:06. Davis explained that it was the "Wild West" because "[e]veryone was trying to find product and secure product." Tr. 359:24–25. Caglione attested to the general chaos of the industry at the time: "in that industry that was going on at that time there were so many people making false misrepresentations, just like they did to Icon" and "they were going out making false videos, claiming they owned product. We had people come in and inspect product that was ours, and turn around and try to sell it back to us. It was an absolute nightmare." Tr. 89:23–90:04

rejection. *See* Tr. 335:11–17; Stipulated Facts ¶¶ 20, 23. Accordingly, a reasonable jury could have determined in light of the "nature, purpose, and circumstances" of the rejections that Elevation reasonably timely rejected the Test Kits.

The two cases Icon cites for the proposition that rejection based on late delivery specifically must, as a matter of law, be made "upon delivery or shortly thereafter" do not require the Court to upend the jury's verdict. Icon Mem. at 13. In fact, these non-binding cases stand for the general proposition that rejection on any grounds must happen "within a reasonable time" after delivery and do not support Icon's assertion that rejection around a month after a late delivery is always untimely. *See Prentice Corp. v. Related Indus., Inc.*, No. 84-cv-0725, 1984 WL 2500, at *2 (E.D.N.Y. Oct. 23, 1984) (finding rejection based on late delivery untimely when made ten months after delivery); *Nederlandse Draadindustrie NDI B.V. v. Grand Pre-Stressed Corp.*, 466 F. Supp. 846, 851 (E.D.N.Y.), *aff'd sub nom. Nederlandse Draadindustrie Ndi B. v. Grand Pre-Stressed Corp.*, 614 F.2d 1289 (2d Cir. 1979) (finding that the buyer made no rejection at all "much less within a reasonable time").[9]

Accordingly, a reasonably jury could have found the purported rejections were made within a reasonable time.

---

[9] The other cases Icon cites for the proposition that rejection about a month after delivery is untimely as a matter of law do not require a different result. None is binding on this Court, none is dated more recently than thirty-eight years ago, and none states that rejection slightly more than a month after delivery is unreasonable as a matter of law. Rather each properly determines the reasonableness of the time of rejection based on the particular facts in the individual case. *N. Bloom & Son (Antiques) Ltd. v. Skelly*, 673 F. Supp. 1260, 1266 (S.D.N.Y. 1987); *In re Wild Lilly, Inc.*, 51 B.R. 963, 965 (S.D.N.Y. 1985); *Dailey Mills v. State*, 200 Misc. 811 (N.Y. Ct. Cl. 1951); *Milz & Cie v. Bloomfield*, 146 Misc. 649, 650, 262 N.Y.S. 580 (Sup. Ct. N.Y. 1932) (applying the "Personal Property Law," N.Y. Pers. Prop. Law not the N.Y.U.C.C.).

*b. A Reasonable Jury Could Have Found That*
*Elevation's Rejections Were Effective*

In a contract for sale of goods in New York, the buyer may reject the goods if they "fail in any respect to conform to the contract." N.Y. U.C.C. Law § 2-601 (McKinney 2025). At trial, Elevation alleged that it rejected the First and Second Shipments on several grounds, which included late delivery of the First Shipment, lack of authorization of the Second Shipment, short-dated expiration dates on both shipments, and incomplete chain of custody documentation for both shipments. DX-39; 243:11–16. Icon has not established a complete lack of evidence supporting a finding that at least one of the stated grounds for rejection were adequate under the law.

First, a reasonable jury could have found that the oral rejections purportedly made to Itum prior to the March 2022 Letter, were effective though they were not written down. *See* Icon Reply at 2–3. Icon argues that Goldsmith's failure to recollect exactly what he said to Itum dooms the purported oral rejections for two reasons: (1) rejections must be "clear and unequivocal," *see* Icon Mem. at 5 n.1 (citing *Maggio Importato, Inc. v. Cimitron Inc.*, 189 A.D.2d 654, 592 N.Y.S.2d 325 (1st Dep't 1993) ("mere complaint about the goods does not constitute a clear and unequivocal act of rejection")), and (2) a reasonable jury could not have determined whether "valid reason[s] [were given] for rejection." Icon Mem. at 6 (citing a treatise and citing *Y & N Furniture, Inc. v. Nwabuoku*, 190 Misc. 2d 402, 405, 734 N.Y.S.2d 382 (Civ. Ct. 2001)).

These arguments are unavailing. A reasonable jury could have found that Goldsmith's statements to Itum were more than "mere complaints." *See Maggio*, 189 A.D.2d at 654. Goldsmith characterized his statements specifically as "rejections" and testified that, in response

Itum stated that Lee would not take the Test Kits back and refused to refund the purchase price.[10]
Tr. 259:20–260:01.  A jury could infer from this testimony that Itum understood that Elevation
was not just lodging complaints, but attempting to reject the Test Kits.

Further, Icon misconstrues the law regarding whether "valid reasons" are required to make
an effective rejection.  A buyer is not always required to contemporaneously list each reason for
rejection to effectively reject goods.  *See* N.Y. U.C.C. Law § 2-605 (McKinney 2025) (explaining
that a buyer may "give a quick and informal notice of defects in a tender without penalizing him
for omissions in his statement"); *see also* N.Y. U.C.C. Law § 2-607 cmt. 4 (McKinney 2025)
(explaining even the revocation of an acceptance "need merely be sufficient to let the seller know
that the transaction is still troublesome and must be watched" and need not "include a clear
statement of all the objections that will be relied on by the buyer" to establish a breach).  As the
Court explained to the jury,[11] *see* Tr. 508:16–25, a rejecting buyer is only required to state a
"particular defect" in its rejection of goods under two circumstances: (1) "where the seller could
have cured it if stated seasonably" or (2) if the contract is between merchants, when after rejection
the seller has made a request in writing for "a full and final written statement from the buyer of all
defects on which the buyer proposes to rely."  N.Y.U.C.C. §§ 1-205, 2-605.  Icon did not establish
at trial, and has not argued here, that either circumstance applies.  Moreover, even if the jury found
Goldsmith's oral rejections were not effective, a reasonable jury could have found that the March
2022 Letter was timely and effective.

---

[10] The Icon Parties made no objection to Goldsmith's testimony regarding what Itum told him.  However, the Court
notes that here the testimony is only used for the fact of the conversation and for Itum's state of mind, not the truth of
whether Icon would provide a refund or take the Test Kits back. *See* Fed. R. Ev. 803(1) & (3).

[11] Before charging the jury, the Court confirmed that neither party objected to the jury instructions that the Court
intended to use.  Tr. 422:13–18.  After the charge was read to the jury, the Icon Parties requested two minor
clarifications unrelated to this jury instruction, to which Elevation did not object, and which the Court implemented
and explained to the jury.  Tr. 525:02–530:13.

Second, a reasonable jury could have found Elevation properly rejected the First Shipment based on late delivery. There is clearly sufficient evidence supporting a finding that the First Shipment was delivered late and thus "fail[ed] . . . to conform to the [December 31] contract." N.Y. U.C.C. Law § 2-601 (McKinney 2025). On December 31, 2021, Zegarelli signed a letter on Gypset letterhead and addressed to the Department of Defense c/o Elevation Health LLC that stated Gypset was "ready, willing and able" to deliver 1,504,200 Test Kits, that Gypset had "the inventory available for purchase," and if payment was timely made, half of the delivery would be available for pick-up on January 4, 2022, and the other half on January 5, 2022. Stipulated Facts ¶ 2 (citing DX-4). The December 31, 2021 invoice stated that the "[p]roduct can be shipped or picked up within 24 of receipt of wire [of $2,640,000 from Elevation]." DX-3. Elevation wired the purchase price of $2,640,000 to Gypset the same day. Stipulated Facts ¶ 4 (citing PX-3). On January 6, 2022, Gypset wired $2,249,333.00 to Icon, which was tasked with shipping the Test Kits to Elevation. Stipulated Facts ¶ 5 (citing PX-4 and citing PX-5.) However, the Test Kits were delivered to Elevation more than a month after they were due on February 15, 2022, and even then, only a portion of the contracted Test Kits were delivered. Stipulated Facts ¶ 20 (citing PX-36).

Third, a reasonable jury could have found Elevation properly rejected both shipments because they did not include long expiration dates and proper chain of custody documents as required by oral terms of the agreements. *See* DX-3 (bare bones December 31, 2021 invoice with no contractual terms beyond price, quantity and delivery date); PX-41 (bare bones February 14, 2022 invoice with few contractual terms beyond price, quantity and delivery date); Tr. at 222:3–18 (Goldsmith testifying that long expiration dates were a term of his agreements with Icon and Gypset); Tr. 248:02–06 (Goldsmith testimony that the March 2022 Letter, admitted as DX-39, stated that both shipments were rejected for several reasons including "extremely short expiration

dates" was based on "promises that were made and never fulfilled"); DX-19 (text between Goldsmith and Davis in which Goldsmith states "If I don't get a BOL tomorrow or Monday, I am exercising my right to get the money back," followed by "our agreement was clear" and Davis replying "Bill of lading and or product delivered by end of day Monday or sooner or money back Tuesday morning confirmed"); DX-4 (December 31, 2021 Gypset letter to DOD and Elevation stating "We stand to meet or exceed all requirements"); Tr. 215:18–217:12 (Goldsmith testimony about his own understanding that the statement "We stand to meet or exceed all requirements" made to the Department of Defense included the requirement of expirations dates between six and twelve months into the future); Tr. 247:24–248:06, 267:16–24, 274:22–25 (Goldsmith testimony suggesting that chain of custody documents were required by "rules and regulations" and stating that he believed he "couldn't use [the Test Kits for Elevation's] clients" apparently because of the lack of chain of custody documents); PX-65 (email from Goldsmith to Caglione asking for lot numbers and chain of custody documents for both shipments stating "I can't seem to locate those documents"); PX-77 at 1 and 17 (demonstrating that, at the time of delivery to Elevation in February 2022, the Test Kits had expiration dates of June or July 2022)[12]; PX:67; Tr. 307:06–308:25 (demonstrating that the bills of lading provided did not clearly show that the Test Kits were shipped from an iHealth location).

Icon argues that the presence of short expiration dates on the Test Kits is not an adequate reason for rejection because neither the December 31, 2021 nor the February 15, 2022 invoice include Goldsmith's stated requirement that the Test Kits must bear expiration dates between 6 to

---

[12] Icon points to testimony that these expiration dates were extended by the FDA several times, to March or April 2023. *See* Icon Mem. at 7; Icon Reply at 4 (citing PX-62 at 4; PX-77 at 1; Tr. 100:12-101:04, 301:22-303:05, 327:23-328:08), a reasonable jury could have credited Goldsmith's testimony that he had agreed to contractual requirement that the expiration dates on the boxes be further out than 6 months from delivery because he understood that his clients—schools and other non-profits—would not purchase short-dated Test Kits despite the FDA's extensions, and thus these extensions did not change the fact of the breach. Tr. 256:02–257:22.

12 months upon delivery to Elevation.  *See* Icon Mem. 7, 14 (citing Tr. 329:07-10 and citing PX-41; Icon Reply at 4 (citing Tr. 216:09-217:12).   Icon further argues that this term cannot supplement the written invoices as an oral term.  Icon Reply at 4 (citing N.Y.U.C.C. §§ 2-201, 2-202).  Icon explains that that, in its view, oral terms requiring expiration dates longer than 6 months would make performance of the contract "impossible" and—"[p]er N.Y.U.C.C. § 2-202" and uncited, unidentified "applicable case law"—"a written agreement cannot be supplemented with oral terms that would make performance impossible."  *Id.*

Neither cited U.C.C. section requires the Court to hold that a reasonable jury could not find that oral terms supplemented the invoices here.  N.Y.U.C.C. § 2-201 stands for the proposition that generally a "contract for the sale of goods for the price of $500 or more"—each of the contracts here—"is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties."  *Id.*   However, the first comment to that section makes clear that "[t]he required writing need not contain all the material terms of the contract."  *Id.* cmt. 1.  Further, N.Y.U.C.C. § 2-202 states that

> in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented . . . by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

*Id.* Here, Icon presented no evidence or argument that the bare bones invoices at issue here are "complete and exclusive statement[s]" of the terms of the agreement and there is evidence before the jury that the parties supplemented the invoices with oral agreements.  *See* DX-3; PX-41.[13]

---

[13] Icon's argument that an impossible-to-fulfill oral term is necessarily contradictory to a written agreement is wholly unsupported by any law in its brief and the argument is raised for the first time in its reply brief.  Accordingly, the Court in its discretion will not address it.  *In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472, 485 (S.D.N.Y. 2017), *modified*, No. 12 MISC. 381, 2017 WL 564676 (S.D.N.Y. Feb. 13, 2017) ("the law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered.").

Accordingly, a reasonable jury could have found Elevation properly rejected both shipments because they did not include long expiration dates and proper chain of custody documents as required by oral terms of the December 31 and February 15 Agreements.

Finally, contrary to Icon's argument, a reasonable jury could have found that Elevation did not act "inconsistent[ly] with the seller's ownership," and accordingly did not accept the Test Kits. Icon Mem. at 8–9. This issue is significant because a buyer does accept goods if he does "any act inconsistent with the seller's ownership," and, generally, when a buyer accepts goods, he may only revoke acceptance under limited circumstances to obtain the same remedies as are available upon rejection. *See* N.Y. U.C.C. Law §§ 2-602; 2-606 (McKinney 2025); *see, e.g.*, *Campbell v. Bradco Supply Co.*, 194 A.D.3d 143, 147, 143 N.Y.S.3d 680, 684 (2d Dep't 2021) (citing N.Y. U.C.C. Law § 2-711 (McKinney 2025)). Icon points to several text messages that Goldsmith sent to Itum on February 17, 2022, the day the Second Shipment was delivered, and one text from Goldsmith to Itum on March 22, 2022, as evidence that Elevation was attempting to sell the Test Kits, an act inconsistent with Icon's ownership. *Id.* (citing PX-77).[14] First, Icon did not make this argument in its 50(a) motion and has arguably waived the opportunity to do so post-trial. *See* Tr. 424:18–426:03. Regardless, this argument fails. Elevation did not in fact ever resell any of the subject iHealth Test Kits. Tr. 260:05–06, 274:08–11. Icon fails to establish here that Goldsmith's statements—that he "need[ed]" or "want[ed]" to sell variously branded test kits including iHealth or his question whether Itum had any "luck/thoughts on selling" such test kits—were sufficiently inconsistent with the seller's ownership to constitute acceptance. *See* PX-77.

---

[14] The texts show Goldsmith stating "Desperately want to sell my, Flowflex, Ongo and iHealth," "I need to sell [$12 million in test kit inventory] and keep rolling the capital," "I just want my money out truly," "I am not buying more iHealth. I need it sold" on February 17, 2022 and stating "Any update dude? . . . Any other luck/thoughts on selling On Go/ihealth/Flowflex?" on March 22, 2022. PX-77. Goldsmith confirmed that these texts reflected that he was "trying to bump [*sic*] the iHealth Product . . . that Khalid had sold [him]." Tr. 282:24–283:04.

The jury may have inferred from the statements that Elevation was considering accepting the Test Kits if there were an opportunity to re-sell but ultimately did not do so. Icon cites to three cases in support of its assertion that Elevation's mere consideration of resale is an act inconsistent with the seller's ownership. Icon Mem. at 8. Two of those cases found a buyer's completed sales were inconsistent with the original seller's ownership and do not comment on attempted sales at all. *See Franklin Capital Holdings, LLC v. NY Accessory Group, LLC*, No. 13-cv-1153, 2014 WL 2117265, at *4 (S.D.N.Y. May 21, 2014) ("Here, Defendant acted 'inconsistently with the seller's ownership' by continuing to sell the goods even after he allegedly revoked acceptance."); *Sunkyong America, Inc. v. Beta Sound of Music Corp.*, 199 A.D.2d 100, 101, 605 N.Y.S.2d 62 (1st Dep't 1993) ("reselling the goods to its retail customers, constituted acceptance"). Icon cites to one non-binding federal court opinion from 1985 that revokes a temporary restraining order where the Court was "not persuaded" that the plaintiff "met its burden of proving that it is probable it would succeed at trial" on its breach claim against a seller where it "*appear[ed]* that plaintiff's [mere] attempt to sell [goods] constituted an act which was inconsistent with defendants' ownership, and accordingly, indicated plaintiff's acceptance of the goods." *Int'l Minerals & Chem. Corp. v. Cotia Comercio Exportacao E Importacao S.A.*, No. 85-cv-5763, 1985 WL 2308, at *4 (S.D.N.Y. Aug. 9, 1985) (emphasis added). These cases do not establish that the jury verdict should be reversed based on Elevation's conversations about potential sales that never came to pass.

Icon has not demonstrated that it is entitled to judgment as a matter of law on either contract claim, or that Gypset is entitled to judgment as a matter of law on Elevation's contract third-party claim.

### B. Icon Parties Are Not Entitled to Judgment on The Fraud and Civil Conspiracy Claims

Elevation asserted counterclaims and third-party claims against all Icon Parties for fraud and civil conspiracy, alleging that the Icon Parties made repeated misrepresentations concerning their contemporaneous possession of Test Kits, the ability of Gypset and Icon to deliver Test Kits imminently, and statements that, at the time of the December 31 Agreement, they were both "authorized distributors" when in fact only Icon became authorized on February 1, 2022.  *See* Amended Counterclaim ¶¶ 119–45; Amended Third-Party Complaint ¶¶ 119–45; PX-71; Tr. 378:09–11, 343:15–344:07, 339:15–25; DX-5.  Elevation alleged further that these statements were made for the purpose of inducing Elevation to order and pay $2,640,000 for 400,000 Test Kits on December 31, 2021.  *See* Amended Counterclaim ¶¶ 119–45; Amended Third-Party Complaint ¶¶ 119–45; Stipulated Facts ¶¶ 3–4, 20.  The jury found by clear and convincing evidence that the Icon Parties defrauded Elevation and that all Icon Parties, except Zegarelli, engaged in a conspiracy to defraud Elevation.  Tr. 561:06–562:02, 562:03–23.

The Icon Parties now renew their argument that Elevation failed to state a claim for fraud, and thus for conspiracy to commit fraud, because it failed to prove any resulting damages.[15]  The Icon Parties argue that, because the fraudulent statements simply led Elevation to believe that the Test Kits could be delivered sooner than they were ultimately delivered, the lateness caused no injury to Elevation.  Icon Mem. at 17.  Moreover, the Icon Parties argue that because the fraud was related to their ability to deliver the goods required by contract, any injury to Elevation resulting

---

[15] Elevation asserts that this argument was waived because the Icon Parties did not include it in their Rule 50(a) motion at trial.  Elevation Mem. at 15–16.  This is not true.  Regarding the fraud and civil conspiracy claims, Icon Parties argued only about Elevation's failure to show damages, and the Court specifically gave Elevation an opportunity to reply to that argument.  Tr. 426:04–14, 428:19–429:09 ("Why don't you address the point about damages. Where are your damages?").  Accordingly, the issue of whether Elevation adequately alleged damages is properly before the Court and the Court is limited to examining the damages element. *See Galdieri-Ambrosini*, 136 F.3d at 286.

from the fraud would be improperly duplicative of the contract damages awarded pursuant to Elevation's breach of contract counter claim and third-party claim. *See* Icon Mem. at 16 (noting that the damages awarded for the breach of contract claim equaled the purchase price of $2.6 million for the December 31 Agreement and the approximate $180,000 cost of storing the Test Kits that arrived late). The Icon Parties argue that as a result of Elevation's failure to establish resulting non-duplicative compensatory fraud damages, the jury's verdict on civil conspiracy and award of punitive damages should be set aside. Icon Mem. at 17.

Under New York law, to state a claim for fraud a plaintiff must show that the fraudulent misrepresentations "caused injury to the plaintiff." *Solow v. Citigroup, Inc.*, 507 F. App'x 81, 83 (2d Cir. 2013); *see Zanett Lombardier, Ltd. v. Maslow*, 29 A.D.3d 495, 495, 815 N.Y.S.2d 547, 548 (1st Dep't 2006) (identifying "resulting injury" as one of several necessary elements of fraud). A plaintiff may allege a "cognizable injury" for a fraud claim by alleging "out-of-pocket losses" and/or "loss proximately resulting from the fraud." *See, e.g.*, *Cont'l Cas. Co. v. PricewaterhouseCoopers, LLP*, 15 N.Y.3d 264, 271, 933 N.E.2d 738 (N.Y. 2010); *World Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 519 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 695 (2d Cir. 2009). "Out-of-pocket losses" are calculated by "ascertaining the difference between the value of the bargain which a plaintiff was induced by fraud to make and the amount or value of the consideration exacted as the price of the bargain." *Keystone Foods Holdings Ltd. v. Tyson Foods, Inc.*, No. 22-1113-CV, 2023 WL 3477157, at *2 (2d Cir. May 16, 2023) (citing *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421, 668 N.E.2d 1370 (1996))

Though the Icon Parties appear to challenge the element of injury in the fraud claim, rather than the jury's award of damages, their argument implicates the common law rule against double recovery of damages. Without citing any supporting case, the Icon Parties assert that the jury here

could not have found them liable for fraud if the only evidence of damages to Elevation amounted to contractual damages. *See* Icon Mem. at 16. Indeed, when it comes to awarding damages, "plaintiffs cannot recover both benefit-of-the-bargain damages for breach of contract . . . *and* out-of-pocket expenses for fraud. Such a double recovery would put them in a better position than they would have been in had the contract been satisfactorily performed." *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 247 (S.D.N.Y. 2006) (quoting *Ostano Commerzanstalt v. Telewide Systems, Inc.,* 880 F.2d 642, 649 (2d Cir.1989) (emphasis in original)); *see also Topps Co., Inc., v. Cadbury Stani S.A.I.C.,* 380 F. Supp. 2d 250, 268 (S.D.N.Y. 2005).

However, the jury was made aware several times that, if it determined that each element of fraud was met, it was not permitted to award Elevation fraud damages that were duplicative of any breach of contract damages. Although the parties did not request such an instruction in their proposed jury charge, [ECF No. 157], the Court warned the jury about double recovery: "[I]f you find [for Elevation] on both its breach of contract claim and its fraud and/or conspiracy claims, you must consider whether Elevation Health suffered damages by reason of such fraud or conspiracy that are different from any damages that Elevation Health suffered pursuant to its breach of contract claim. That is because Elevation Health cannot recover for the same damages more than once." Tr. 515:08–15.[16] "[J]uries are presumed to be able to follow and understand the court's instructions." *Shariff v. Artuz*, No. 97-civ-2882, 2001 WL 135763, at *3 (S.D.N.Y. Feb.16, 2001) (citing *United States v. Potamitis*, 739 F.2d 784, 790 (2d Cir. 1984), *cert. denied*, 469 U.S.

---

[16] The verdict sheet itself also warned the jury against double recovery. Verdict Sheet ¶ 7 ("If you find that a fraud or conspiracy was committed against Elevation Health, and that Elevation Health suffered damages by reason of such fraud or civil conspiracy that are different from, or in addition to, any damages Elevation Health suffered under a contract, please state the amount of such damages. If you determine that Elevation Health did not suffer any separate harm, please write 'zero.' "); *see also* Tr. 552:05–12. Even Elevation's Counsel explained during summation, "[i]f you've awarded us breach of contract damages of 2.64, you shouldn't award us the same thing for fraud . . . We're not going to double dip here." Tr. 477:12–15.

934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984). The Court will not assume here that the jury disregarded the Court's several relevant instructions when awarding fraud damages to Elevation.

Moreover, the jury could have assessed that Elevation was injured by the Icon Parties' fraud beyond their out-of-pocket contractual damages. Considering the Record, the Court cannot say that there is "a complete absence of evidence supporting the verdict." *See Conte*, 895 F.3d at 171. The jury could have found that Elevation had adequately alleged an injury based on out-of-pocket damages—the purchase price of the December 31 Agreement—and also the difference between the purchase price and the decreased value of the Test Kits at the time of delivery and the loss of concrete business opportunities proximately resulting from such late delivery.[17] The parties stipulated that Elevation paid a purchase price of $2,640,000 for 400,000 Test Kits on December 31, 2021 or about $6.50 per kit. *See* Stipulated Facts ¶¶ 3–4, 20; Tr. 291:10–13, 437:07–15. Goldsmith testified that at the time of the December 31 Agreement, "Covid was spiking" and President Trump had promised to distribute 500 million free tests to Americans. Tr. 214:09–17. He testified that, accordingly, "demand far exceeded supply." *Id.* Various witnesses testified that they understood that Elevation ordered 400,000 tests to supply a company called Medea that would subsequently supply the Department of Defense to distribute the Test Kits to Americans. Tr. 214:12–20; 352:13–25; DX-4. Goldsmith further testified he had a contract to supply Medea and that "Medea needed those tests for the government within that first week of January or January 3rd, 4th, 5th. . . ." not more than a month later when the Test Kits were delivered to Elevation. Tr. 224:09–10; 281:21–23. A reasonable jury could have determined that when the Test Kits were

---

[17] Moreover, even if the jury could only find Elevation suffered out-of-pocket contractual damages, the jury's award of punitive damages must stand because those damages are not implicated by the rule against double-recovery. *See Barrington v. New York*, 806 F. Supp. 2d 730, 740 (S.D.N.Y. 2011) (quoting *Ostano,* 880 F.2d at 649) (the rule against double recovery required crediting liability for breach of contract against actual damages for fraud but not against punitive damages award because "punitive damages are not compensatory and could not cause any double recovery.").

delivered late, on February 15, 2022, the demand for the Test Kits had decreased and/or that Elevation was unable to meet Medea's request for Test Kits by the beginning of January.  *Id.*; Stipulated Facts ¶ 20; PX-36.  Further, an exhibit admitted at trial suggests that the value of Test Kits had in fact decreased over time—in a WhatsApp conversation Goldsmith asked Itum whether he "[s]hould really dump my iHealth with the 9/27 and 10/13 extended expiration at $4?"  *See* PX-77; Tr. 328:13–329:03.  Expressing apparent shock that the value of COVID-19 test kits had decreased, Goldsmith stated, "[i]s that really where pricing is?"  *See* PX-77.  Thus, based on the Record evidence, a reasonable jury could have determined that there was an injury from either the diminished value of the tests or Elevations inability to timely fulfill Medea's request.

Accordingly, the "record does not ineluctably lead to the conclusion" that Elevation received a double recovery or the jury could not have found that the injury element of fraud was satisfied, and the Icon Parties have not satisfied their burden to show "a complete absence of evidence" supporting a finding of fraud.  *Conte*, 895 F.3d at 171; *Nature's Plus Nordic A/S v. Nat. Organics, Inc.*, 646 F. App'x 25, 29 (2d Cir. 2016).

## II. <u>Icon Parties' Motion for a New Trial</u>

Icon moves for a new trial, arguing that: (1) Elevation's Counsel made statements and asked questions that prejudiced the jury, (2) the weight of the evidence is against the verdict, and (3) there were substantial errors in evidentiary rulings.  Icon Mem. at 17–25.  The Court cannot find that the jury has reached "a seriously erroneous result" or that "the verdict is a miscarriage of justice."  *See Ortiz*, 137 F.4th at 72 (quoting *Munafo*, 381 F.3d at 105 ("[A] motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.")).  Accordingly, the Icon Parties are not entitled to another trial.

### A. Icon Parties Are Not Entitled to a New Trial Based On Any Misconduct by Elevation's Counsel

The Icon Parties claim that Elevation Counsel's statements and questions on the following topics warrant a new trial: (1) Icon's alleged sale of counterfeit Test Kits, (2) Icon Parties' former attorney Bryan McKenna and former third-party defendant Khalid Itum, and (3) Icon Parties' withholding of documents in discovery. Icon Mem. at 18–23. None of these arguments is sufficient to entitle the Icon Parties to a new trial.

A party moving for a new trial based on opposing counsel's prejudicial misconduct bears a "heavy burden" since an attorney's conduct will rarely "so infect a trial with undue prejudice or passion as to require reversal." *FIH, LLC v. Barr*, No. 20-489, 2021 WL 5286659, at *5 (2d Cir. Nov. 15, 2021) (summary order) (quoting *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005)). Indeed, "[n]ot every improper or poorly supported remark will irreparably taint[]" the trial. *Id.* A new trial will only be granted if the opposing counsel's conduct created "undue prejudice or passion which played upon the sympathy of the jury." *FIH, LLC*, 2021 WL 5286659, at *5 (*Matthews v. CTI Container Transp. Int'l Inc.*, 871 F.2d 270, 278 (2d Cir. 1989)). When the jury's verdict is substantially supported by the evidence, "improper statements will frequently be *de minimis* in the context of the entire trial." *Ekukpe v. Santiago*, 823 F. App'x 25, 33 (2d Cir. 2020) (summary order) (quoting *Marcic*, 397 F.3d at 124).

Moreover, when the claimed misconduct was not objected to contemporaneously a new trial will not be granted unless the conduct was "so serious and flagrant that it goes to the very integrity of the trial." *FIH, LLC*, 2021 WL 5286659, at *5 (quoting *Marcic*, 397 F.3d at 124). The Second Circuit has warned that district courts should find that misconduct goes to the integrity of the trial "with extreme caution in the civil context." *FIH, LLC*, 2021 WL 5286659, at *5 (quoting *Pescatore v. Pan American World Airways, Inc.*, 97 F.3d 1, 18 (2d Cir. 1996)).

### 1. *Elevation's Suggestion that the Test Kits Were Counterfeit*

The Icon Parties claim that Elevation Counsel committed misconduct warranting retrial when he suggested that Icon dealt in counterfeit tests and that the tests delivered to Elevation were in fact counterfeit. The Icon Parties argue that Elevation Counsel's assertions are not supported by the facts in evidence. *See* Icon Mem. at 20–22. While Icon is correct of course that facts not in evidence may not be argued in summation, reference to facts not in evidence is not always sufficient to warrant a new trial. *See, e.g.*, *Marcoux*, 290 F. Supp. 2d 457, 472 (S.D.N.Y. 2003); *Malmsteen v. Berdon, LLP*, 595 F. Supp. 2d 299, 310 (S.D.N.Y. 2009), *aff'd*, 369 F. App'x 248 (2d Cir. 2010) (denying a new trial though some of counsel's statements during summation were "on shaky evidentiary footing" or "otherwise overzealous" and some statements were certainly not in evidence).

As an initial matter, during trial, the Icon Parties objected to only one question and one summation statement involving the counterfeit issue. *See* Icon Mem. at 20–22 (citing Tr. 276:03–07; 463:19). The Icon Parties did not object to any of the remaining statements about which they now complain. The statements to which the Icon Parties contemporaneously lodged objections did not create "undue prejudice or passion as to require reversal" and the remaining statements were not "so serious and flagrant that it goes to the very integrity of the trial." *See FIH, LLC*, 2021 WL 5286659, at *5.

Neither the question nor the summation statement to which the Icon Parties objected resulted in prejudice, let alone prejudice warranting a new trial. *See* Tr. 276:03–07, 463:19. With respect to summation, the Icon Parties objected when Elevation's Counsel stated: "[a]fter Icon lost its authorization for selling counterfeit, the expiration date's no longer the issue at that time." Tr. 463:18–20. In making its objection, Icon Parties' counsel stated in front of the jury "It's not in evidence." Tr.

463:21–23.  Icon Parties now complain that there had been no testimony demonstrating that Icon lost

authorization "for selling counterfeit."  Icon Mem. at 20–21.  Instead, the Icon Parties explain that an

Icon witness had testified only that Icon had lost its distribution authorization when iHealth had

"accused" Icon of selling counterfeit product.  Icon Mem. at 20–21; Tr. 139:24–140:07.  As the Court

explained at the time there is enough in the Record for Elevation's assertion to be "fair grounds for

argument."  Tr. 463:24–464:01.  Based on the Record, it was not unduly prejudicial or out of bounds

for Elevation to ask the jury to infer that Icon's authorization had been revoked "for selling

counterfeit," or because iHealth believed they were selling counterfeit.  *See, e.g.*, *Ortiz,* 137 F.4th at

62 ("[T]he law makes no distinction between the weight to be given to either direct or circumstantial

evidence" and thus juries may draw reasonable inferences); *Lugo v. City of New York*, No. 14-cv-7185,

2018 WL 11466167, at *2 (S.D.N.Y. July 13, 2018) ("Within broad limits, counsel for both sides are

entitled to argue the inferences which they wish the jury to draw from the evidence").[18]  Elevation

Counsel's phrasing here did not create a "undue prejudice or passion" in the jury which requires

reversal. *FIH, LLC*, 2021 WL 5286659, at *5.

The same analysis applies to Elevation Counsel's question involving counterfeit product

to which the Icon Parties objected.  Elevation's Counsel asked Goldsmith: "How did you Elevation

[*sic*] first learn that Icon lost its authorization over counterfeit product?"  Tr. 276:03–04.  Though

the Icon Parties objected to Elevation's question for "[m]ischaracteriz[ing] the record," Elevation

was well within appropriate bounds to suggest that the jury infer that there may have been an issue

regarding counterfeit products after Goldsmith had indicated his concern about receiving

counterfeit and another witness had stated that Icon's authorization had been revoked for selling

---

[18] Even where a counsel's summation statement calls for speculation rather than a reasonable inference, it does not necessarily warrant a new trial where the cort properly instructed the jury on the difference between inference and speculation.  *See Tesser v. Bd. of Educ. of City Sch. Dist. of City of New York*, 370 F.3d 314, 322 (2d Cir. 2004); *see* Tr. 13:12–18, 498:12–20 (instructing the jury in this case on inferences and speculation).

counterfeit products.   Tr. 263:21–264:15; Tr. 139:24–140.07.   Nevertheless, since Elevation Counsel had not yet established Goldsmith's personal knowledge regarding why Icon's authorization had been revoked, the Court restated the question to remove any reference to counterfeit: "Did there come a time that you understood Icon had lost its authorization?", and thereafter questioning continued.  Tr. 276:03–10.

With respect to the statements to which the Icon Parties did not object, their motion for a new trial based on these statements is "considerably undermined by their failure to object to the statements in question at trial." *Malmsteen*, 595 F. Supp. 2d at 310 (citing *Okraynets*, 555 F. Supp. 2d at 430).  None go to "the very integrity of the trial." *FIH, LLC*, 2021 WL 5286659, at *5.[19]

Most of these cited statements by Elevation's Counsel are well-supported by evidence before the jury that Icon had lost its authorized distributor status because iHealth had accused Icon of selling counterfeit product. *See, e.g.*, Tr. 139:24–140.07 (Caglione testifying that he received emails from iHealth accusing Icon of selling counterfeit product); 276:17–277:12 (Goldsmith testified that he would not resell the Test Kits after he understood the Icon had lost its authorization "over counterfeit product issues.").

Elevation's Counsel may have overstepped to the extent he suggested to the jury that Elevation had proved that the Test Kits at issue in this case were in fact counterfeit and thus the Icon Parties had committed fraud or breached their contracts. *See* Tr. 473:03–06; 475:18–23, 479:04–08.  However, these unobjected to statements do not go to "the very integrity of the trial." *FIH, LLC*, 2021 WL 5286659, at *5.  Indeed, there was some evidence presented that could cause a jury to doubt on the legitimacy of Icon/Gypset Test Kits, and Goldsmith testified that he had

---

[19] Moreover, the Icon Parties inflate the number and severity of the remaining purportedly improper statements made by Elevation.  They cite to sequential lines of the transcript as separate instances of improper summation and even count one line twice. *See* Icon Mem. at 11 (citing Tr. 469:18 and Tr. 469:19 as well as 470:01 twice, apparently because the word "counterfeit" appears twice within the same line).

concerns about their authenticity based on the chain of custody documents provided by Icon and the revocation of their authorization. *See* Tr. 115:10–21, 113:18–115:02, 134:23–135:01, 211:02–06, 271:04–13, 272:05–08, 272:12–273:12, 276:17–277:12, 306:22–308:25, PX-67; PX-70. Significantly, the Icon Parties took advantage of the opportunity on rebuttal to challenge Elevation Counsel's suggested inference about the legitimacy of the Test Kits. Tr. 480:07–15 (asserting that there is no evidence sufficient to "prove" that the Test Kits at issue were counterfeit), 480:16–482:10 (detailing the chain of custody evidence that was before the jury).

Further, the Court instructed the jury several times that the evidence in the case was made up of "sworn testimony of the witnesses . . . , the exhibits that were received into evidence and the stipulations of the parties," that "closing statements . . . are not evidence," and that it was their duty "to decide all of the fact issues in this case based on the evidence presented in the courtroom during the trial." Tr. 14:01–03, 15:09–11, 419:13–17, 504:01–02. "[J]uries are presumed to be able to follow and understand the court's instructions." *Marcoux*, 290 F. Supp. 2d at 472; *Shariff*, 2001 WL 135763, at *3 (citing *Potamitis*, 739 F.2d at 790). The Icon Parties have not demonstrated otherwise. Moreover, when the Icon Parties objected to part of Elevation Counsel's summation as stating facts not in evidence, the Court explained again that the jury would "assess what is and what isn't in evidence." Tr. 448:04–08. Similar to *Marcoux*, the Court's "instructions [on what is and is not evidence], in combination with the Court's directives during the summation of [Elevation's] counsel, likely cured [any] prejudicial effect of the frequent, but relatively minor misconduct of plaintiff's counsel."[20] 290 F. Supp. 2d at 472; *see also Abreu*, 2020 WL 13890188, at *20 ("To the extent

---

[20] The same applies to the Icon Parties' allegation that Elevation improperly stated that it was their burden to prove the Test Kits weren't counterfeit. Icon Mem. at 21–22. The Court repeatedly explained to the jury that the Court would "instruct [them] on the law," not the parties. Tr. 13:17–21; 13:23–24; 488:02-04. Both parties reminded the jury of the same during summation. Tr. 435:16–17; 438:09–11; 444:25–445:01; 457:12; 458:18-20. The jury is presumed to understand that it should not rely on any counsel's explanation of the law.

Defendants argue that Plaintiff's counsel mischaracterized the evidence, the Court instructed the jury that statements of an attorney in summation and throughout trial are not evidence.").

Finally, the jury in this case deliberated for many hours, over the course of two days, *see* Tr. 531:25, 537:01–07, 538:06–07, 543:02, and during that time, the jury sent eleven notes to the Court—to ask questions and request exhibits, amply demonstrating their attempt to apply the law to the evidence adduced at trial. *See* Tr. 532:06–549:22. Clearly, the verdict in this case was "the product of careful consideration and reasoning, rather than a passionate or prejudiced reaction" to counsel's comments about potentially counterfeit Test Kits. *Marcoux,* 290 F. Supp. 2d at 473 n.9; *see also Smith*, 856 F.2d at 472; *Okraynets*, 555 F. Supp. 2d at 427.

In sum, the Icon Parties have not demonstrated how, given their context and the totality of the evidence, Elevation Counsel's statements, either created undue prejudice or passion in the jury, threatened the integrity of the trial or caused a seriously erroneous result. *See FIH, LLC*, 2021 WL 5286659, at *5; *Ortiz*, 137 F.4th at 72. The assert that these statements caused the jury to award "million dollars of damages from thin air" and that its verdict on all claims is "evidence of their desire to punish" the Icon Parties. Icon Mem. at 23. However, there is nonetheless ample evidence to support the jury verdict and the Court has no doubt that a reasonable jury could have reached the verdict here based on the evidence it heard at trial. *Ekukpe*, 823 F. App'x at 33 (2d Cir. 2020) (holding that when a jury's verdict is substantially supported by the evidence, "improper statements [by counsel] will frequently be *de minimis* in the context of the entire trial."). Moreover, the jury's measured award of punitive damages indicates that the Icon Parties themselves have created out of thin air speculation that the jury was prejudiced against them.[21]

---

[21] During summation, Elevation urged that if the jury found fraud based on a finding that the Icon Parties had sold counterfeit Test Kits, then "they deserve some serious damages," but otherwise the jury should only award punitive

Since the Icon Parties have not shown, nor does the record reflect, that Elevation's remarks caused a seriously erroneous result, a new trial is not warranted.[22]

### 2. Elevation's References to Itum and McKenna

The Icon Parties also ground their Rule 59 motion for a new trial on certain of Elevation Counsel's references to the withholding of documents in discovery, Icon Parties' former attorney Bryan McKenna's indictment and disbarment, and former third-party defendant Khalid Itum's criminal conviction and his choice to plead the fifth at deposition.[23]  *See* Icon Mem. at 18–20.  The Icon Parties argue that these statements referred to facts not in evidence and improperly prejudiced the jury against the Icon Parties.  Icon Mem. at 18.  Reviewing these statements and considering them in light of the case as a whole, the Court finds that none was so prejudicial as to warrant a new trial.

The Court notes that the vast majority of the opening and summation statements cited in the present motion were not objected to when made.  *See* Tr. 51:17–23, 455:15–456:09, 456:14–16, 446:21–447:05, 473:11–12, 473:23–25.  As explained above, "[w]hen the complaining party fails to object at trial to statements made during summation, the court will only grant a new trial when the 'error is so serious and flagrant that it goes to the very integrity of the trial.' "  *Malmsteen*, 595 F. Supp. 2d at 309; *Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, 955 F. Supp. 2d 118, 156 (E.D.N.Y. 2013).  The Court finds no flagrant error here.

---

damages of "a few hundred thousand."  Tr. 478:20–479:08.  The jury awarded a much lesser amount, just $180,000 total distributed amongst most of the Icon Parties.  Tr. 553:01–554:01.

[22] The Court also does not find that the Icon Parties were unduly prejudiced by any delay by any delay by Elevation in raising the theory that Icon and Gypset dealt in counterfeit goods.  As Elevation explains, it has argued some version of this counterfeit allegation since it amended its counterclaim and third-party complaint over two years before the trial began.  *See* Amended Counterclaim ¶¶ 91–98; Amended Third-Party Complaint ¶¶ 91–98 (both alleging that the Test Kits were delivered "without the proper chain of custody documentation or lot numbers that should have demonstrated that the Test Kits were *legitimate*, and originated properly from iHealth, as opposed to being *counterfeit* Test Kits" and were thus "unusable"); ECF No. 116 at 19.

[23] Khalid Itum was voluntarily dismissed prior to trial.  *See* Itum Voluntary Dismissal.

Further, Elevation's comments in this regard, though at times imprudent, were not central to "the real issues before the jury." *See Johnson*, 593 F. Supp. 3d at 71. At the time of trial, neither Itum nor McKenna were parties to or involved with the litigation and, though the Icon Parties were subject to sanctions based on their failure to participate in discovery, the issue of discovery was not relevant to any of the claims in this case.

Moreover, the Court's instructions on what is and is not evidence and the length of time that the jury deliberated weigh against granting a new trial based on Elevation's statements about McKenna and Itum. *See, e.g.*, *Marcoux*, 290 F. Supp. 2d at 472. Further, nearly all of the statements to which the Icon Parties now object were made during Elevation's opening and closing, *see* Tr. 51:17–23, 435:15–456:09, 456:14–16, 446:21–447:05, 447:24–448:09, 473:11–12, 473:23–25, during which attorneys are afforded significant latitude. *See Parrish*, 280 F. Supp. 2d at 168.

Further, the Icon Parties have not directed the Court to any cases where a new trial has been ordered based on statements similar to those about which they now complain. *See* Icon Mem. at 18 (citing *Hopson v. Riverbay Corp.*, 190 F.R.D. 114, 122 (S.D.N.Y. 1999) (granting a new trial where defense counsel made numerous false statements about plaintiff himself and false statements of law, including over sustained objection) and citing *Fineman v. Armstrong World Indus., Inc.*, 774 F. Supp. 266, 269 (D.N.J. 1991), *aff'd*, 980 F.2d 171 (3d Cir. 1992) (granting a new trial where attorney made repeated appeals to sympathy, speculation and passion rather than reason and those appeals "undoubtedly . . . produced the jury's verdict.")); *see also* Icon Reply at 6 (citing *United States v. Washington,* 263 F. Supp. 2d 413, 432 (D. Conn. 2003), *adhered to on reconsideration*, 294 F. Supp. 2d 246 (D. Conn. 2003) (awarding a new criminal trial where the prosecutor asserted that defense counsel had created false evidence, referred to facts excluded by a court order, and used phrases such as "I think," "I would suggest to you," "I believe," and other

35

similar rhetorical devices at least thirty times in summation)).  In sum, the Court cannot find that

Elevation's references to McKenna and Itum led to a "seriously erroneous" result or a "miscarriage

of justice."  *See Ortiz*, 137 F.4th at 72.

### B. The Icon Parties Have Not Demonstrated That the Jury's Verdict Was Against the Weight of the Evidence

The Icon Parties' request for a new trial base on the assertion that the verdict was against

the weight of the evidence consists of a single paragraph in its opening brief, that refers the Court

back to arguments it made in support of its motion for judgment as a matter of law.  Icon Mem. at

23–24.  Icon's reply brief addresses the issue in three sentences, again relying generally on the

"reasons set forth in the moving papers."  Icon Reply at 8.  The Icon Parties have certainly not met

their burden to establish that "the jury has reached a seriously erroneous result or its verdict is a

miscarriage of justice."  *See, e.g.*, *Maureen Christensen v. Cnty. of Dutchess*, N.Y., 548 F. App'x

651, 653 (2d Cir. 2013) (quoting *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003));

*Mindspirit, LLC v. Evalueserve Ltd.*, 470 F. Supp. 3d 366, 377 (S.D.N.Y. 2020) ("[O]n a motion

for a new trial, the moving party bears a heavy burden.").

### C. None of the Challenged Evidentiary Rulings Warrants a New Trial

Finally, in support of a new trial pursuant to Rule 59, the Icon Parties argue that the Court

improperly admitted hearsay testimony.  Icon Mem. 24-25.  It is well-settled that a court should

only award a new trial based on an evidentiary error if the admission of evidence was both a "clear

abuse of discretion" and was "so clearly prejudicial to the outcome of the trial" that the Court is

"convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage

of justice."  *S.E.C. v. Stamoulis*, 350 F. App'x 499, 501 (2d Cir. 2009) (quoting *Phillips v. Bowen*,

278 F.3d 103, 111 (2d Cir. 2002)).  Prejudice in this circumstance, is measured "by assessing the

error in light of the record as a whole." *Marshall v. Randall*, 719 F.3d 113, 116 (2d Cir. 2013) (quoting *Marcic*, 397 F.3d at 124).

The Icon Parties contend that a new trial is warranted because the Court overruled their hearsay objections. Icon Mem. at 24 (citing Tr. 216:09-218:04 (Goldsmith's testimony regarding his understanding of the government's requirements for Test Kits that it purchased), 256:02-257:23 (Goldsmith's testimony regarding why he believed the extension of expiration dates did not remedy his inability to resell Test Kits to his clients), 274:08-275:03 (Goldsmith's testimony that he believed he was not permitted to resell the Test Kits received from Icon and Gypset), and 276:22-277:07 (Goldsmith's testimony that he believed Icon had lost its authority to distribute COVID-19 test kits because of "counterfeit product issues")). The testimony cited here was not in fact hearsay since it was not offered for the truth. *See* Fed. R. Evid. 801(C). Indeed, when overruling each objection, the Court repeatedly instructed the jury that the testimony was admitted only for Goldsmith's "state of mind, not for the truth of the matter." *See* Tr. 216:24–217:01, 217:24–218:04, 256:09–10, 257:17–19, 274:18–19, 275:03, 277:06–07.

The Court did not clearly abuse its discretion when it overruled the Icon Parties' hearsay objections. The Icon Parties argue that the Court's admission of this testimony only for Goldsmith's "understanding" or "state of mind," rather than for the truth of out-of-court statements was improper because there was no other relevant purpose for the admission of the testimony except to "give credence to Elevation Health's claim that Gypset and/or Icon delivered 'short-dated' product and that they otherwise breached their contractual obligations." Icon Mem. at 32. The Icon Parties explain further that Goldsmith's state of mind was irrelevant to any claims in the case, so the testimony must have been admitted and used as hearsay evidence. Icon Mem. at 24; Icon Reply at 9.

First, only two parts of the testimony complained of here, in fact reported on an out-of-court statement made to Goldsmith, potentially subjecting it to the rule against hearsay. *See* Fed. R. Evid. 801(C), 802; Tr. 217:02–05 ("[The government] also indicated that expiration dates on those test kits needed to be a minimum of between six and 12 months because there were so many different brands that had different expirations and people were talking about extensions. But the government was very clear about needing that longer dated expiration because they were distributing them over time, and so they did not want them to expire."); 257:13–16 ("My clients at the time, schools and other nonprofits, told me, told us that they would not accept—we could not perform testing with test kits that had that expiration and that were so short-dated."). Immediately after the challenged testimony was given, the Court provided limiting instructions to the jury. Tr. 217:24–218:04 ("But I remind you again, ladies and gentlemen, I'm not admitting this for the truth of the fact that these were the government requirements. I'm allowing Mr. Goldsmith to testify to what his understanding was and what his mindset was at the time he was dealing with the parties to this case"), Tr. 257:17–19 ("Now, again I am going to instruct the jury that is not being offered for the truth that the schools had that position.").

Otherwise, the testimony at issue here reflects Goldsmith permissibly testifying to his own understanding, knowledge or opinion not any out-of-court statement. *See* Tr. 274:22–25 ("And in your understanding was it permissible for Elevation to sell the test kits? . . . No."); 276:24-277:04 ("[D]id you gain other information that Icon had lost its authorization? Yes. Q. And was it your understanding that was over counterfeit product issues? A. Yes."); Fed. R. Ev. 701.

The Icon Parties are incorrect that the subject testimony could not be admitted for Goldsmith's state of mind because his state of mind was irrelevant to any claims in the case. *See* Icon Mem. at 24; Icon Reply at 9 (arguing that intent is irrelevant to a breach of contract claim).

Relevance is a "low threshold" that is "easily satisfied." *United States v. Velissaris*, No. 22CR105 (DLC), 2022 WL 17076747, at *1 (S.D.N.Y. Nov. 18, 2022) (quoting *United States v. Gramins*, 939 F.3d 429, 450 (2d Cir. 2019)).  Evidence is relevant if it has "any tendency" to make a consequential fact "more or less probable than it would be without the evidence." *Id.* (quoting Fed. R. Evid. 401).  "To be relevant, evidence need not be sufficient by itself to prove a fact in issue . . . ." *Id.* (quoting *United States v. Litvak*, 808 F.3d 160, 179-80 (2d Cir. 2015)).  Here, the subject testimony about Goldsmith's own understanding and knowledge could have some tendency to show, among other things, the reason Elevation decided it was important to include certain terms in its agreement with the Icon Parties, whether those terms were in fact included in the agreement, why Goldsmith later rejected the Test Kits, whether the rejections were effective. Consequently, the testimony could also be relevant to questions regarding whether Icon breached certain contract terms with nonconforming product.

Finally, the cautionary instructions issued by the Court regarding Mr. Goldsmith's testimony sufficiently cured any potential prejudice. *See, e.g.*, *Ojeda*, 477 F. Supp. 3d at 78 (quoting *Zafiro v. United States*, 506 U.S. 534 (1993)) (finding that new trial was not warranted when the court issued curative instructions because "juries are presumed to follow their instructions"); *see also Claudio*, 955 F. Supp. 2d at 149 (finding the court's "various warnings to plaintiff's counsel, along with its thorough limiting instructions to jury, were sufficient to counteract any question that might have been raised in the jury's mind").  The Court is simply perplexed by the Icon Parties' conclusory statement that the curative instructions here "had the effect of legitimizing the evidence being proffered." *See* Icon Mem. at 25.  Significantly, the Icon Parties do not cite to a single case granting a new trial in similar circumstances.

Having examined all of the Icon Parties' arguments, the Court sees no basis for a new trial based on the alleged evidentiary errors.

### III. Elevation's Cross-Motion

Elevation cross-moves for the Court (i) to hold Icon and Gypset jointly liable for contract damages as joint-venture partners and (ii) to add pre- and post-judgment interest to the Judgment. *See* Elevation Mem. at 26–27. Neither the notice of the cross-motion, nor the supporting memorandum of law or reply identifies the applicable Rule of Civil Procedure pursuant to which the cross-motion is brought. Cross Mot., Elevation Mem., Elevation Reply. Local Civil Rule 7.1 requires motions to include a notice of motion that "specif[ies] the applicable rules or statutes pursuant to which the motion is brought." SDNY Local Rule 7.1(a)(1). Though Elevation's motion could be denied for failure to comply with Local Rule 7.1(a)(1) alone, *see VIPIN SEHGAL, Plaintiff, v. KARENA FOODS INC., et al., Defendants. Additional Party Names: Eda Foods Inc., Mughlai Indian Cuisine*, No. 23-civ-8799, 2025 WL 1866285, at *2 (S.D.N.Y. July 7, 2025), courts in the Second Circuit "have been reluctant" to dismiss for violating the rule, reasoning that "it would serve the interests of justice to resolve the motion . . . on the merits rather than on procedural deficiencies," *see Anhui Konka Green Lighting Co., LTD. v. Green Logic LED Elec. Supply, Inc.*, No. 18-civ-12255, 2021 WL 621205, at *1 (S.D.N.Y. Feb. 17, 2021)) (collecting cases).

However, it appears that, the cross-motion is untimely. Elevation brought this cross-motion thirty-five days after the Judgment was entered. Elevation Mem. If this motion is construed as a Motion to Alter or Amend the Judgment under Rule 59(e), as it appears to be, it is untimely. Fed.

R. Civ. P. 59(e) ("A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment.").[24]

"The Second Circuit has long recognized that Rule 59(e) generally applies to motions for prejudgment interest, and have rejected attempts to circumvent the time limitations promulgated for filing such motions." *See Oldcastle Precast, Inc. v. Liberty Mut. Ins. Co. Metra Indus., Inc.*, No. 7:16-cv-01914, 2019 WL 5884528, at *3 (S.D.N.Y. Nov. 8, 2019), *aff'd in part, vacated in part on different grounds, remanded sub nom. Oldcastle Precast, Inc. v. Liberty Mut. Ins. Co.*, 838 F. App'x 649 (2d Cir. 2021) (citing *Lee v. Joseph E. Seagram & Sons, Inc.*, 592 F.2d 39 (2d Cir. 1979) and citing *Goodman v. Heublein, Inc.*, 682 F.2d 44, 45 (2d Cir. 1982)). Motions seeking prejudgment interest and post-judgment interest "involve[] the kind of reconsideration of matters encompassed within the merits of a judgment to which Rule 59(e) was intended to apply." *Id.* (quoting *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 176 (1989)) (alteration in the original). Especially where a "jury's verdict had not included an award of prejudgment interest, the judgment omitting such an award accurately reflected that verdict, and the omission of an award of such interest could not be considered a clerical error" such that the "reasonable time" standard of Rule 60(a), rather than the twenty-eight-day deadline of Rule 59(e), should apply. *In re Frigitemp Corp.*, 781 F.2d 324, 327 (2d Cir. 1986); *Lee*, 592 F.2d at 44; *see also Boyce v. Soundview Tech. Grp., Inc.*, No. 03-civ-2159, 2005 WL 627780, at *2 (S.D.N.Y. Mar. 17, 2005) (motion for pre-judgment interest will not be construed as a Rule 60(a) motion "where the claimant has failed request prejudgment interest at some time prior to filing the Rule 60(a) motion.").

---

[24] Elevation's argument that its motion is not time barred according to New York procedural law is clearly erroneous. Here, to the extent any of the cited New York procedural rules set out a different standard than the Federal Rules of Civil Procedure, the Federal Rules govern. *See, e.g.*, *La Liberte v. Reid*, 966 F.3d 79, 87 (2d Cir. 2020); *see also Roistacher v. Bondi*, 624 F. App'x 20, 21 (2d Cir. 2015) (applying the Federal Rules of Civil Procedure to determine timeliness of post-trial motions).

However, "[u]nder New York law, an award of prejudgment interest from the date of verdict to that of judgment is mandatory, and the clerk of the court should automatically include such an award in the judgment," the failure to do so is a "clerical error," and accordingly, the Elevation motion is timely pursuant to Rule 60(a), at least with respect to post-verdict, pre-judgment interest. *In re Frigitemp Corp.*, 781 F.2d at 327; *Goodman*, 682 F.2d at 46 (citing N.Y. C.P.L.R. § 5002); *see also Dudley v. Penn-America Ins.,* 313 F.3d 662, 666 (2d Cir. 2002) (holding that "Rule 60(a) is the proper vehicle for correcting a judgment in order to provide for an award of prejudgment interest where, among other things, governing law would make the interest award automatic or the district court clearly intended to make the interest award in its prior order"). Here, since six days elapsed between the date of the verdict and the entry of the judgment and post-verdict, pre-judgment interest should apply. *See* Tr. 539, 550–55; [ECF No. 192 ("Judgment")].

Moreover, the Second Circuit has "consistently held" that an award of post-judgment interest is mandatory. *See Schipani v. McLeod*, 541 F.3d 158, 165 (2d Cir. 2008) (citing *Westinghouse Credit Corp. v. D'Urso,* 371 F.3d 96, 100 (2d Cir. 2004) and citing 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court.")). In accordance with federal statute, post-judgment interest must be "calculated from the date of the entry of the judgment." *Id.* (quoting 28 U.S.C. § 1961(a)); *Oldcastle Precast, Inc.*, 2019 WL 5884528, at *4. Accordingly, the Court must award Elevation post-judgment interest here. *See Emamian*, 2022 WL 2056275, at *9 (recommending awarding mandatory post-judgment interest though plaintiff failed to move to amend a judgment that excluded post-judgment interest within 28-days).

However, the Court cannot grant Elevation's untimely motion for a holding that Gypset and Icon are jointly liable for the damages awarded pursuant to Elevation's breach of contract

claim. Elevation never requested this relief at any point prior to the filing of the judgment. *See* Tr. As such, without objection from Elevation, the verdict form did not reflect the now-requested relief. *See* Verdict Sheet. There is no evidence whatsoever that the absence of a holding that the parties are jointly liable was merely a "clerical error" in the judgment that "failed to reflect the actual intention of the court" such that the motion could be construed as timely under Rule 60(a). *See Dudley*, 313 F.3d at 666. Accordingly, Elevation's motion to hold Gypset and Icon jointly liable for its breach of contract damages is also properly construed as a motion under Rule 59(e) and is untimely.

Elevation's motion is denied, except to the extent it requests post-verdict, pre-judgment interest and post-judgment interest.

## CONCLUSION

For the foregoing reasons, Icon Parties' renewed motion for judgment as a matter of law or, in the alternative, a new trial is DENIED.

Elevation's motion to alter or amend the judgment is DENIED in part and GRANTED in part. The motion to alter or amend the judgment is GRANTED only with respect to an award of post-verdict, pre-judgment interest at a rate prescribed by N.Y. C.P.L.R. § 5002 and an award of post-judgment interest at a rate prescribed by 28 U.S.C. § 1961(a).

The Icon Parties' request for oral argument in support of their motions is DENIED.[25]

The Clerk of Court respectfully is requested to terminate the motions pending at docket entries 193, 196, 198, and 204.

---

[25] *See, e.g., Klipsch Grp., Inc. v. Big Box Store Ltd.*, No. 12-cv-6283, 2016 WL 11944285, at *1 (S.D.N.Y. Sept. 30, 2016) (denying motions for oral argument where the court did "not believe that oral argument would be beneficial to [its] determination of either set of motions").

SO ORDERED.

Date:  **September 26, 2025**
      **New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**